# EXHIBIT A

IN ARBITRATION PROCEEDINGS PURSUANT TO THE
COLLECTIVE BARGAINING AGREEMENT BETWEEN THE
PARTIES

| | | |
|---|---|---|
| INTERNATONAL LONGSHORE AND WAREHOUSE UNION, KODIAK LONGSHORE UNIT 222, | ] ] ] ] ] | Opinion and Decision |
| Union, | ] ] ] | of |
| and | ] ] | John Kagel Coast Arbitrator |
| EMPLOYERS SIGNATORY TO THE ALL ALASKA LONGSHORE COLLECTIVE BARGAINING AGREEMENT, | ] ] ] ] ] ] ] | |
| Employers. | ] ] ] | May 16, 2025 Palo Alto, California |
| Re: Appeal of AK-2018-08, item 5, remedy | ] | |

APPEARANCES:

For the Union: Emily M. Maglio, Esq., Leonard Carder, Oakland, CA

For the Employer: Douglas S. Parker, Esq., Ethan Picone, Esq., Ballard Spahr, Portland, OR

INTRODUCTION:

The caption of this Decision refers to "Employers." While they filed the original appeal in this case, the Employer involved in this matter is the Matson Navigation Company of Alaska. It is referred to as the "Employer" or "Matson" throughout. Further,

1

Counsel for Matson, Douglas Parker, Esq., is Counsel to the Alaska Marine Employers Association (AMEA)

. Matson and APL (now CMTA) are the two members of the Association. (Tr. 230) When an issue affects one of its members, here Matson, the Association's Counsel represents it, as he has throughout these proceedings. (Tr. 231) Matson, in that instance, would expect AMEA's Counsel's legal focus and professional activity would be based solely on Matson's interest, consulting with Matson for his direction from it. (Tr. 269, 275-276, 298)

ISSUES:

The issues as stated by the Union are:

"1. Whether the Coast Arbitrator should further enforce the February 13, 2020 Award and, as a remedy, direct Matson to reimburse ILWU for its reasonable legal fees and costs incurred in defense of the lawsuits filed by Samson Tug and Barge, Case Nos. 3:20-cv-00108-TMB-MMS, 3:20-cv-00248-TMB-MMS (D. Alaska), and any appeals thereof, both prospectively and retrospectively. (Joint Exhibit 7)

"2. Whether the Coast Arbitrator should further enforce the February 13, 2020 and October 4, 2021 Awards by directing Matson to (1) cease and desist from enforcing or applying Article VII of its Terminal Services Agreement with Samson, (2) withdraw its notice of indemnification with Samson, with notice to the ILWU, and (3) inform Samson that pursuant to your order, Matson is prohibited from enforcing or applying Article VII of

2

its Terminal Services Agreement with Samson, also with a copy to the ILWU. (Union Exhibit 91)"

Matson's statement of the issues in this matter are:

"1. Whether Matson violated Section 19.1 of the AALA by having discussions with third party employer, Samson, regarding its litigation against the ILWU? If yes, whether the bad faith proved by the ILWU was cause of the Samson litigation against the Union? If yes to both, whether the Arbitrator has the authority under the AALA to require Matson to reimburse the ILWU its legal fees and costs reasonably incurred in defense of the lawsuit?

"2. Whether the Arbitrator has authority under the AALA to order Matson to cease and desist seeking indemnity from third party Samson, whether the Union has proved that Matson has violated the AALA or the Arbitrator's February 13, 2020 Award by entering into the indemnity provision and a third party contract with Samson?"

The Coast Arbitrator has been given the authority by the Parties to determine the issue(s) to be decided within the parameters of the above proposed issues after the submission of the case to him. (Tr. 197-198)

AGREEMENT PROVISIONS:

> **"SECTION 11. DISP[UTES AND GRIVANCE PROCEDURE JOINT PORT LABOR RELATIONS COMMITTEE …**
>
> 11.66 The powers of the arbitrator shall be limited strictly to the application and interpretation of the Agreement as written, including the Welfare and Pension Agreements. The arbitrators shall have jurisdiction to decide any and all disputes arising under the Agreement, including cases dealing with the resumption or continuation of work.

3

11.67 The arbitrator's decisions must be based upon the showing of facts and their application under the specific provisions of the All Alaska Agreement and attendant letters and memorandums of understanding and be expressly confined to and extend only to the particular issue in dispute. The arbitrator shall have the power to pass upon any and all objections to his jurisdiction. …

11.68 All decisions of the arbitrator shall be final and binding upon all parties....

## SECTION 19. GOOD FAITH OBSERVANCE

**19.1** As an explicit condition of agreement the parties exchange commitments that this Contract will be observed in good faith. In answer to the Employer's demand for such a guarantee, the Union Negotiating Committee unanimously voted to commit every local and every member to observe such commitments without resort to gimmicks or subterfuge. The Employers gave a similar guarantee of good faith observance on their part.

**19.11** In order to implement this good faith guarantee, it is agreed that whenever the local grievance machinery becomes stalled or fails to work, the matter can be referred at once by either party to the next step of the grievance machinery for disposition. Any problems arising over changes in local working or dispatching rules because of the new contract provisions thus can be referred to the next step of the grievance machinery for prompt disposition."

**APPENDIX F**
July 1, 1993
**ARBITRATION PROCEDURES AND GUIDELINES**

…An Arbitrator has no authority to decide any other issues except those that are in dispute, nor shall the Arbitrator have any authority to add to, subtract from, or otherwise change or modify the provisions of this Agreement. The Arbitrator shall only be authorized to interpret existing provisions of this Agreement as they may apply to the specific facts of the issue in dispute." (Jt. Ex. 1)

GENERAL BACKGROUND:

4

On October 4, 2021, the undersigned issued a decision in this matter which outlined much of the factual issues involved in this matter, and provides the general background for the decision here:

"'STIPULATED BACKGROUND:

PROCEDURAL HISTORY

ILWU and AMEA and other signatory employers are parties to the All Alaska Longshore Agreement (hereinafter 'AALA'). Matson Navigation Company of Alaska, LLC (hereinafter 'Matson') is a member of AMEA and an AALA signatory. ...The parties negotiated an extension agreement to the 2015-2020 AALA through June 30, 2022. ...

Under the dispute and grievance procedure in the AALA, ILWU Unit 222 submitted a grievance against Matson concerning the performance of work at the private dock Matson owned in Kodiak, Womens Bay Terminal. The grievance alleged that Matson violated Sections 1.1, 1.11, 7.61, and Letter of Understanding No. 12 of the AALA.

This grievance ultimately was heard by the Alaska Arbitrator, who issued several decisions on ILWU Unit 222's grievance. In the last decision, issued on June 3, 2019, Alaska Arbitrator Herald Ugles issued Award AK-2019-08 denying the ILWU's grievance regarding the impact of Matson's ownership of the terminal. ...

The ILWU appealed Alaska Arbitrator Ugles' denial of part of the grievance to the Alaska Area Committee. The Alaska Area Committee did not reach agreement on the Union's grievance. As a result, ILWU appealed to Coast Arbitrator John Kagel.

On February 13, 2020, the Coast Arbitrator issued an award under the AALA in the Appeal of AK-2018-08, Item 5. ... In this Award, the Coast Arbitrator stated LOU [Letter of Understanding] 12, Section 3 [contained in the AALA] is applicable to the LASH dock [Matson Womens Bay facility] under this record and is required to be enforced there. LOU 12, Section 3 provides that: Non-signatory employees shall not operate any cargo handling equipment on facilities owned or operated by Signatory Employers beyond an area designated and agreed to jointly by the parties. ...

On December 29, 2020, ILWU submitted a 'Request for Order

5

Clarifying Award in Appeal of AK-2018-08, Item 5.' ...

On January 6, 2021, Matson submitted a response to ILWU's Clarification Request. ...

On January 11, 2021, ILWU submitted its response to Matson's January 6 letter. ...

On January 14, 2021, the Coast Arbitrator and counsel for the parties, ILWU and AMEA discussed the procedure for hearing ILWU's request, including on whether the Coast Arbitrator or Alaska Arbitrator had jurisdiction over ILWU's request and on whether ILWU's request for clarification was better titled a request for enforcement. Following this meeting, on February 1, 2021, the parties reached the following agreement on how to proceed with ILWU's request:

The parties have agreed, on a one-time, non-precedential basis, that you [Coast Arbitrator] have jurisdiction under AALA Section 11.67 to hear the Union's request for enforcement and/or clarification of your ruling regarding Matson and Womens Bay Terminal. ...

Subsequently, the parties agreed to postpone the hearing on ILWU's request until after the federal district court issued a ruling on Samson Tug & Barge's [Samson] motion for a preliminary injunction seeking to enjoin enforcement of the Coast Arbitrator's February 13, 2020 Award. After Samson's motion was denied and its petition to vacate the award dismissed, and following a further meeting between the Coast Arbitrator and counsel for the parties, oral argument and, to the extent necessary, receipt of evidence, on ILWU's request was set to be heard on July 16, 2021.'

FURTHER BACKGROUND:

Matson and the ILWU agreed that Matson would implement the Coast LOU 12 Decision. (Tr. 55) Matson also agreed it would pay the Union in lieu of physically employing its members while Matson worked out a Terminal Services Agreement (TSA) with its tenant, Samson, as well as Matson acquiring cargo handling equipment. (Tr. 23, 55) Samson's cargo there was handled by members of the Marine Engineers Beneficial Association (MEBA) under their collective bargaining agreement with Samson. (Ex. A, Ex. 9) Samson had been using that dock before Matson acquired the premises.

6

Due to the complications surrounding the Covid-19 pandemic, among other reasons, the Union, after an initial inquiry in March 2020, did not ask Matson if a Samson-Matson TSA had been agreed to, and Matson did not volunteer to the Union that it had been in June 2020. (*See* Tr. 13-18, 30, 33)

In the meantime, MEBA notified the Union that Samson was suing the ILWU, which suit when filed would seek to overturn the Coast LOU 12 arbitration decision as well as seeking damages from the Union. (Tr. 39-40) In a phone conversation in May 2020, according to the Union, the Union informed Matson that a lawsuit was forthcoming. According to Matson, in that call the Union agreed to continue to accept time-in-lieu payments until the lawsuit was resolved. (*See* Tr. 30, 41, 49, 51, 58-59, 6769)

Samson continued to perform work using MEBA labor and its equipment at Womens Bay, Matson paying time-in-lieu to the ILWU, which amounts, and approximately twenty-five percent more, were reimbursed to Matson by Samson from March 2020 through February 2021. (Un. Ex. 12)

Matson entered into its TSA with Samson dated June 16, 2020, which included the following provisions:

> '...WHEREAS, Contractor [Matson] and Carrier [Samson] are parties to that Lease Agreement dated August 1, 2014 (as amended, the 'Lease'), by which Contractor leases a portion of the Terminal to Carrier for its barge operations; ...

> ARTICLE II. TERM OF AGREEMENT

> A. The term of the Agreement shall begin on or about June 16, 2020 and shall continue until June 30, 2022. This agreement shall terminate in the event that the Lease is terminated. ...

> ARTICLE Ill. DESCRIPTION OF TERMINAL SERVICES
> Contractor agrees to perform terminal services necessary to discharge and load the vessels and perform daily yard operations subject to the general supervision, directions and instructions of Carrier. Contractor will use ILWU labor for all such services, including minimum manning as set forth in Schedule A. Carrier shall provide and maintain all equipment and supplies necessary for Contractor to perform the terminal services. ...

7

## ARTICLE VII. PERMISSIBLE USE OF CARRIER'S OWN LABOR

Carrier and Contractor agree that on Carrier's request Carrier's own labor may be used for terminal services performed at the Terminal as an alternative to Contractor providing terminal services under this Agreement. If the ILWU submits 'time in lieu' claims to Contractor for such services performed at the Terminal by Carrier's own labor, Contractor will invoice Carrier for such 'time in lieu' claims in accordance with Article VI. Despite the effective date of this Agreement, Carrier expressly agrees to pay such 'time in lieu' claims dating back to February 13, 2020. In the event that a Court or Arbitrator determines that any such ILWU 'time in lieu' claims were improper, Carrier's recourse shall be from ILWU and not Contractor. Carrier may only use its own labor for terminal services with Contractor's advance written permission.

In the event that Carrier's own labor is used for terminal services, Carrier agrees Contractor's obligations set forth in Article IV shall not apply. When Carrier's own labor is used for terminal services, Carrier shall indemnify Contractor Parties from and against any liability, damage and claim (and all expenses connected therewith, including attorneys' fees and costs) relating to or arising from such services.

Attached was 'Schedule A' that included:
'The parties agree to the following minimum ILWU manning:

Daily Yard (non-vessel) Operation:
1-Top-pick Operator 1-Longshoreman 1-Yard Foreman

During Barge Operations:
On Barge: 1-Top pick/Bull Operator 1-Hatch Tender 4-Longshoreman
On dock: 1-Walking Boss 1-Checker 1-Top pick Operator 1Longshoreman 1-Dock Tender

Notification/Dispatch: Dispatching labor must occur before 20:00 local time the evening before operations.

These manning requirements are subject to change based on discussions between the ILWU, Contractor, and/or Carrier.

8

They are also subject to change based on arbitration or court
rulings.'

Schedule B listed 'billing rates for ILWU labor' by
classification. (Ex. A, Ex. 4, Ex. B)

According to the Union, in December 2020 the Union learned of the TSA
from a Samson court pleading. (Tr. 18) The Union then sought that Matson
enforce the LOU 12 Coast decision to include excluding Samson from
handling cargo at Womens Bay. Matson maintained the Union had agreed
to continue the in-lieu payments pending the court outcome. At the urging
of the federal judge, the Union agreed to withhold seeking further arbitral
proceedings, and maintain the *status quo* until the judge could rule. That
ruling came out in March 2021, which dismissed Samson's application to
overturn the LOU 12 decision. Matson then advised Samson to cease its
Womens Bay operations using MEBA labor. Samson, according to Matson,
vacated Matson's facility, moving its Kodiak operation to a new dock
established by non-AALA member Alaska Marine Lines at Shannon Point,
which was adjacent to Matson's Womens Bay facility." (Jt. Ex. 5)

On March 13, 2024, a further Coast decision was issued on the Employer's motion

to delay a Union-sought hearing on remedy arising from the above decisions. The

decision on the motion was:

"The arbitration hearing will not be delayed. The substantive issue
will be the Union's claimed collusion between Matson and Samson
with respect to the causing of the filing and continued pursuit of
the lawsuit. Matson's arbitrability issues will also be heard.

If the Union prevails at arbitration, only the remedy of attorneys'
fees will be imposed, if awarded. Any decision concerning
indemnity will be postponed until after a further arbitration
hearing when there is a final judgment in the lawsuit." (Jt. Ex. 6)

This decision deals with the sought-for attorneys' fee issue, and, because it has

become ripe, to decide the indemnity issue raised by the Union concerning the Samson-

Matson TSA. Four days of additional hearings were held, two in Portland, Oregon, and two

remotely, one of an accountant, and a final one, after delay due to the witness' health

9

condition, of George Baggen, CEO of Samson. The Parties filed opening and reply briefs, and this decision follows.

## POSITIONS OF THE PARTIES

### Position of the Union:

That Matson actively conspired with Samson to sue the ILWU and undermine the February 13, 2020 award after entering into the TSA to permit nonsignatory employees to perform ILWU work; that it did so, as the Court found on the same evidence, that (1) Matson through Samson challenged the award, (2) developed the lawsuit against the ILWU, (3) entered into the TSA contravening the award, (4) exchanged legal research, (5) created alleged damages including its profit charged over the amounts of time-in-lieus, (6) collaborated in seeking a TRO to avoid the "clarification" arbitration, all in violation of Sections 18.14 and 19.1 of the Collective Bargaining Agreement; that Matson's intentional actions foresaw the financial harm they would pose to the Union; that Matson's claimed defenses lack merit; that the Coast Arbitrator has the authority to award the relief sought by the Union; that Matson should be sanctioned for its bad faith conduct to include payment of attorneys' fees at reasonable market rates; that Matson should be ordered to withdraw its indemnification demand to Samson as well as ordering it to desist from further violations of LOU 12; that the AALA includes make whole remedies; that Matson conceded it violated Section 18.14; that Matson did not inform Samson in March 2020 that

10

it was intending to implement the February Award; that the Union sought to resolve issues with the MEBA did not break causation from Matson's conduct; that MEBA withdrew from the lawsuit before damages were sought by Samson.

Position of the Employer:

That with the Union admitting that Matson had the right to pursue its own lawsuit against the Union that would not have been in bad faith, that Matson communicating with Samson was no violation of Section 19.1; that Matson could have readily joined with Samson in its suit; that even if bad faith was found, the Union cannot show that Matson caused Samson's lawsuit against the Union; that if Matson had cancelled its month-to-month lease, with Samson having no other place to carry out its critical Kodiak operations, it would have led to an even bigger Samson suit against the Union; that the Collective Bargaining Agreement does not provide for consequential damages for the Arbitrator can only interpret and apply it as written, with Section 19.11 providing that the only remedy for a violation of Section 19.1's good faith guarantee which is limited to stalled grievance machinery to refer the matter to its next step; that Coast arbitration decision C-1-90 found no authority to award damages for violation of a no-strike clause under similar agreement language as here; that communications between Matson and Samson regarding a potential challenge to the initial Coast arbitration impacted Matson as landowner and Samson as lessee; that communications between their counsel concerned publicly available information; that communications about potential or actual litigation are subject to

11

litigation privilege even if made by a third party to such action; that the Union was aware that Matson was not supporting or rooting for the Union when Matson declined to provide a requested declaration supporting it; that the Court in its summary judgment decision did not decide whether Matson acted in bad faith under the Agreement, but that Samson entangled itself in the Matson-ILWU dispute, not that Matson did so in the Samson lawsuit; that there is no issue preclusion by that decision in this arbitration where the Court decided a different issue under a different standard where Matson did not participate in the Samson litigation; that Matson did not cause the Samson lawsuit brought by it and the MEBA, with no causal relationship between a breach of the Agreement and a loss of some contractual benefit where the Union would have incurred damages regardless of the breach as here given the dire economic and operational impact on Samson of the 2020 Coast Award; that the Union's position with MEBA was leverage to gain Samson waterside work at Pier II, with MEBA defending its members' jobs; that Samson was always going to file a lawsuit, with its resolve maybe hardening when the NLRB upheld the waterside work for MEBA in April 2020; that Samson decided to litigate given Kodiak's critical location for its work to be done by MEBA personnel; that the Union's position seeking the work at Pier II and its willingness to allow MEBA personnel at Womens Bay caused the lawsuit with Samson not budging; that there is no claim that Matson had anything to do with MEBA regarding the lawsuit where MEBA joined Samson as co-plaintiff; that Section 19.11 provides the sole remedy for a violation of Section 19.1, the Parties having, but eschewing, the opportunity to agree to allow monetary damages for its breach; that to allow such damages would rewrite the contract to expose both Parties for any number of perceived wrongs such

12

as failures to properly dispatch gangs, safety violations, etc.; that Agreement Section 11.66 strictly limits the application and interpretation of the Agreement as written and the remedy sought was specifically not contemplated by the Parties when they negotiated the Agreement; that that conclusion is consistent with the Union's past federal court position in 2016 as stated to the Court then contesting employers seeking damages for failure to dispatch gangs to participate, ratify or encourage a work stoppage; that the indemnity issue between Matson and Samson arises under their separate commercial contract and is not subject to arbitration under the Agreement; that it was entered into for legitimate good faith business reasons; that the Arbitrator has no authority under the AALA or otherwise to award market rate attorneys' fees nor fees and costs of these arbitrations; that there is no damages claim cognizable under Section 18.14; that counsel communications do not show that Matson caused Samson to file a lawsuit, the Union relying on speculation and conjecture which the Arbitrator cannot do; that while Management might have been well-intentioned in early March meetings to accommodate the Union's implementation objectives as best it could, that initial intention quickly was sidetracked by the Covid pandemic, which placed great demands on Matson management in meeting the need to safely provide supplies to Alaska; that at the same time Samson pushed back due to MEBA and Samson's needs to counter Young's settlement options; that Tungul's recollection of the March lunch meeting was credible, while Samson already knew the 2020 arbitration decision would affect its business; that the Union did not show that bad faith caused its damages; that since damages are not specified in the AALA as within the authority of an arbitrator, enforcement remedies are for the courts; that the Union has not provided any

13

evidence of fees and costs it has actually incurred; that the Union is seeking remedies outside of the issues that are the subjects of this arbitration in violation of the AALA; that the Union has been awarded $43,000 in costs from Samson; that no costs should be awarded for Union officer or member attendance at arbitration hearings; that damages could have been avoided, at least in part, by the Union petitioning to enforce the 2020 Award, as it did in another case.

DISCUSSION:

Additional Facts:

During the proceedings in this matter, additional witness testimony added to the facts gleaned from the prior Coast hearings. In addition, discovery in the Samson v. ILWU lawsuit produced relevant factual material in this matter.

Matson's Statement to Union That It Would Implement February 2000 Award:

After the February 13, 2020 Coast Award came down, Matson determined not to challenge it. (Tr. 234) On March 4, 2020, Bal Dreyfus, Alaska Senior Vice President, Jennifer Tungul, Vice President of Alaska Operations, and Rick Kniaziowski, Matson Kodiak Terminal Manager, met with three ILWU officials, including Dennis Young, Alaska Longshore Division President. (Tr. 70, 235, Young and Tungul) Dreyfus did not recall meeting with the Union to discuss implementing the February Award nor any other communication with Samson before sending it a draft of a TSA in May 2020. (Tr. 213)

At that meeting, Matson affirmed it would implement the February Award "right away," to hire ILWU-represented workers to perform all cargo handling work at Womens

14

Bay, would work out manning, and discussed a period of time where ILWU-represented personnel would be paid time-in-lieu (TIL) until Matson would have a TSA with Samson for the ILWU to be put to work. (Un. Ex. 96, pps 88-93) Equipment requirements would have to be arranged for which would take time. (Tr. 73, 242) According to Young, Dreyfus stated that if Samson would not enter into a TSA, Matson would tell it to vacate the facility (Tr. 71); that he would have a conversation with Samson the next day about the need to enter into a TSA for the ILWU to perform work at Womens Bay. (Tr. 75)

ILWU manning was agreed to at Womens Bay by the Union and Matson as of March 20. As of that date, the start of the COVID-19 shutdown, Matson stated it had not heard back from Samson on a TSA, but Matson legal was working on it. (Un. Ex. 23, Tr. 203-204)

Union Seeks to Resolve Issues:

At the time of the February 2020 Award there was an LMRA 10k hearing scheduled before the NLRB concerning Samson's waterside work at Pier 2 in Kodiak being performed by its MEBA-represented employees. That work was being claimed by the ILWU.

On March 5, Young emailed the February 2020 Coast decision and proposed three options to resolve the oncoming 10k proceedings to four MEBA representatives:

1. Allow Samson/MEBA to operate at Womens Bay and ILWU waterside at Pier 2 as well as changes at Dutch Harbor with Samson/MEBA honoring ILWU jurisdiction including APL cargo and equipment at AALA ports.

15

2. ILWU only would work at Womens Bay with Samson picking up and delivering cargo at point of rest there by truck.

3. Samson cancel its Womens Bay lease. (Un. Ex. 5)

When this was sent, Young believed that Matson and Samson were meeting to discuss these options, based on his conversation with Dreyfus the day before. (Tr. 77) Young had also discussed the proposed options with Samson in 2019. (Tr. 89) Proposing these options was his attempt to resolving the Kodiak/Samson jurisdictional issues between the ILWU and MEBA. (Tr. 103, *see also* Tr. 110-112) (The ILWU and Samson agreed before the federal District Court that Young's email "constitutes a settlement communication." (Er. Ex. CH p. 24))

George Baggen, Samson's CEO, testified he never discussed the three options with Dreyfus or anyone at Matson. (Tr. 379-382, 391) He had heard of the proposals before 2020 and would not agree to them, given Samson's necessary Kodiak operations and the impact of alternatives or the lack of them. (Tr. 421 *et seq.*)

<u>Dreyfus and Baggen :</u>

On March 5, 2020, Dreyfus, Tungul, Baggen, and Samson's counsel William Royce had lunch in Anchorage just prior to that year's Iditarod race. Dreyfus and Baggen had never met before. Beforehand, AMEA's Douglas Parker, acting as Matson's counsel, emailed Royce that Dreyfus would be meeting with Baggen and Royce. Dreyfus wanted to know if he also needed to have a lawyer. Parker advised about the general nature of what Royce wanted to talk about, the Samson lease and dock deterioration. (Un. Ex. 2)

16

Tungul testified that at the lunch Baggen was told of the February Coast Award, and what would follow was a TSA utilizing ILWU labor at Womens Bay. Baggen "pushed back," but she could not recall what he said, except that Samson's work was done by MEBA employees. (Tr. 246) He did not like the discussion that if he did not agree to such a TSA, his lease would have to be cancelled. She did not remember whether there was any assurance that Samson would comply, but there was no change in her view as to what to do. (Tr. 246)

Dreyfus did recall the lunch with Baggen, but not a conversation about the need to enter into a TSA. (Tr. 213) Baggen stated he totally recalled the lunch. Young's three options never came up. (Tr. 393) Nor did the TSA. (Tr. 394) Nor did the February Award about which he had knowledge—probably from Samson's counsel—despite that it was important to keep Samson's operation at Womens Bay and Samson was making plans to do so. (Tr. 434-435, 443-444) Baggen stated he had no conversations with anyone at Matson once he learned that Matson was not appealing the February 2020 Award. (Tr. 382) The first conversation he could recall about anything meaningful with Matson was about the TSA in May 2020. (Tr. 368, 377, 381)

Samson's Suit Against ILWU to Vacate February Award:

When Baggen did become aware of the Award in February or early March, he knew there were serious implications for his business. He knew, or suspected, that Samson would have to pay TIL to have his own employees work at Womens Bay. (Tr. 412, 441) That location was the only place where it could conduct operations when it needed to reshuffle loads with his experienced, longtime employees. It was impractical to do that at some other

17

port. To not do so at Kodiak would have required a major reconfiguration of its business model. (Tr. 400, 413-414)

In determining to file a lawsuit, Baggen, who made the decision to sue (Tr. 406), said he had no conversations with Matson:

> "The only thing that I didn't like was: We had a landlord, we had no problem with the landlord, and he was just doing what he needed to do. The only problem I had is what we were doing -- and I had no conversations with Matson -- but we needed a channel so that Matson knew what we were doing, and I guess that was you [Parker], we thought, because we were doing things that was affecting what could happen on their property." (Tr. 415)

Baggen directed Samson's counsel to keep Matson's counsel informed, as Matson was Samson's landlord, but did not know if that happened. (Tr. 415, 439-440)

Young testified he was notified by MEBA's International President that Samson was filing the lawsuit on May 11. Young called Dreyfus, assuming that Samson was suing the Union and Matson. Dreyfus told him he knew nothing about it. (Tr. 83) Later that afternoon, Dreyfus sent Young a copy of the lawsuit, stating he had not read it yet. (Un. Ex. 39) Matson was not named as a defendant in it, at any point.

While Tungul had knowledge of Parker's efforts on behalf of Matson concerning Samson's subsequent litigation against the Union, she did not remember when that occurred. She testified that Dreyfus, as then-president of AMEA, did have that knowledge. (Tr. 293-294) She did not know about the lawsuit until Dreyfus patched her in on his call from Young about it. She had not heard anything about what Parker was doing with respect to a lawsuit. (Tr. 250) Dreyfus testified he was unaware that Parker was working with Samson to seek to vacate the February Award. (Tr. 212-213)

18

During the call, Tungul testified that after being made aware of the lawsuit, she and Dreyfus told Young they would like to continue TILs during it, to which Young agreed. (Tr. 251) She later testified that in an affidavit in the Samson litigation that Young "did not disagree or object" to continuing TILs during the lawsuit: "It's been four years, so we'll go with this." (Tr. 280)

On a Zoom call on May 14, Dreyfus told the Union he did not understand why Matson was not sued. Also, the Union was told that Samson was not responding to Matson about a TSA. (Tr. 85) In fact, it was not until May 29 that Dreyfus sent Baggen Matson's initial draft TSA including Article VII allowing Samson to use its own labor. (Un. Ex. 44)

In July 2020, Young asked Matson for a letter of support for the Union's motion to dismiss Samson's suit explaining the grievance procedure of the AALA and that the February decision was final and binding. (Tr. 89, Un. Ex. 49) Matson Assistant General Counsel Nathan Jaskowiak advised Young that Matson declined because it didn't want to get involved with a dispute between its tenant and the ILWU. He emailed Union counsel Emily Maglio:

> "Hi Emily,
>
> I just left you a voice message, but wanted to send you a follow-up email because I know you have an upcoming deadline on your motion to dismiss. I touched base internally on your draft declaration and received significant hesitation to signing a declaration in support of the ILWU's position. While we would normally have no issue with providing the ILWU with a declaration, and the content of your draft is fairly non-controversial, Samson is still our lessee and we don't want to provide a declaration and take a position against our lessee. In addition, Matson did not prevail in the Kagel decision, so it would be strange for Matson to provide declaration in support of a motion to dismiss an action attempting to overturn that decision.

19

The lease amendment should be part of the arbitration record so there should be an alternative way to authenticate that document." (Er. Ex. CX.)

<u>Matson-Samson Terminal Service Agreement:</u>

Beginning in mid-March, Tungul was involved in Covid issues, as was the Union. (Er. Ex. DA, p. 14) She did have Kniaziowski look into equipment to operate at Womens Bay, learning that it was a very high expense, with issues concerning supply constraints. (Tr. 249-250)

The initial draft of the TSA with Samson was prepared by Matson legal. (Tr. 206) Dreyfus said the provision allowing Samson, with Matson's approval, to use its own employees was proposed by Samson and accepted by Dreyfus:

> "...because they had a labor agreement with another union, MEBA, so that was an issue for them; and then we, at Matson, obviously try to respect, and we do respect, the labor agreements that we signed with all the unions, including that we have relationships with MEBA in other areas." (Tr. 206-207)

As noted, Article VII allowing Samson to use its own labor was in Matson's original draft. Dreyfus stated that Matson drafted TSA language to provide if TIL claims were improper, Samson's recourse was limited to the ILWU, not Matson, because Matson was aware of Samson's lawsuit. (Tr. 217) One of the two changes sought by Samson, relayed to Dreyfus from Baggen, in turn relaying from Samson's counsel:

> "**Article VII Permissible Use of Carrier's Own Labor** is the main feature of the proposed agreement This article allows Samson to use its own labor and pay ILWU time in lieu charges as it challenges the Coast Arbitrator's decision. I strongly recommend this clause be modified to give Samson the right to use its own labor at Womens Bay terminal in exchange for Samson agreeing to pay ILWU time

20

in lieu charges for such labor. The proposed Article VII makes depending on Matson's continued consent which may be withdrawn at any time for any reason. This places too much risk on Samson as it challenges the Coast Arbitrator's decision for the benefit of both Samson and Matson." (Un. Ex. 46)

Baggen speculated that the benefit to Matson would be Samson as its tenant. (Un. Ex. 100, p. 582, Tr. 387-388) The provision was ultimately changed to allow Samson's labor with Matson's "advance written permission." (Un. Ex. 47)

Samson also sought to extend the proposed term from one to two years to cover the period anticipated for the ILWU litigation to be resolved. Matson had no problem with those proposals since it could terminate Samson's lease on 30 days' notice. (Un. Ex. 46)

With respect to the TSA provision contemplating the use of ILWU labor, Dreyfus stated:

> "So the agreement really gave us the ability to, depending on how things played out, we could work with time-in-lieus and then if those, that resolved on the labor agreement side, then the contract would still be enforced to enable us to use ILWU with Samson's labor off not doing the work." (Tr. 208)

Baggen stated that with respect to the TSA there was no discussion of Matson doing the work. (Tr. 371) "Everybody knew…" that Samson would pay TILs. "[I]t was only like five seconds on it. I mean everybody knew what was going to be in there, so there was nothing to discuss." (Tr. 372) Dreyfus told Baggen: "We're not a stevedoring company." (Tr. 373) There was no discussion about purchasing equipment nor Matson being able to use Samson's equipment to do stevedoring work at no cost to Matson. (Tr. 374-375)

With respect to the TILs Matson paid to the ILWU members—the payroll costs that would have been paid had the ILWU members actually done the work—Matson billed

21

Samson. Matson also billed Samson an added fee as Matson's profit for providing its payroll services. (Tr. 225)

Samson v. ILWU District Court Proceedings:

On May 11, 2020, the U. S. District Court for the District of Alaska, in Anchorage, docketed Samson's petition to vacate the February 13, 2020 Coast Award. Petitioners were Samson and MEBA. (Un. Ex. 41, Er. Ex. AK) That petition was dismissed by the Court on April 9, 2021. (Er. Ex. CH, p. 2, fn. 13)

On October 5, 2020, Samson, for itself, while the petition to vacate was pending, filed a Complaint for Damages and Injunctive Relief against the Union. It alleged under LMRA Section 303 that the Union's conduct was an unfair labor practice by forcing Samson to assign work to the ILWU rather than its own employees who were represented by MEBA, Samson being damaged by having to pay TILs to ILWU members. (Jt. Ex. 8, Ex. 1)

On March 25, 2022, Samson filed a First Amended Complaint for Damages. MEBA had dropped out of the litigation earlier. Noting that TIL payments had exceeded $700,000, it alleged that the ILWU had forced Samson from Womens Bay to a smaller and less cost-effective facility. It sought an order blocking further TIL charges at Womens Bay, damages as established at trial, and fees and costs. It alleged that the ILWU had committed unfair labor practices and statutory violations, including that the ILWU had proceeded to the February 2020 Coast arbitration with the objective of using the AALA to cease Samson from doing business with Matson. (Un. Ex. 114)

22

A second amended complaint was filed by Samson on September 2, 2022, to include allegations concerning the Union's International officers and institution, as well as others, as defendants. (Un. Ex. 115) A third was filed on February 20, 2024, removing the International as a defendant, and sought damages from the Union arising out of Matson's making a claim for indemnity to it based on the Union's motion for damages. (Un. Ex. 104)

On August 22, 2024, the District Court granted summary judgment in favor of the ILWU, dismissing Samson's compliant. The Court also denied Samson's motion for summary judgment that it had sought. A notice of appeal to the Ninth Circuit Court of Appeals has been docketed.

<u>Matson Lawyers' Contacts with Samson's:</u>

In addition to Parker's email to Royce before the March 5, 2020 lunch with Dreyfus and Baggen (Un. Ex. 2), the following lists evidence submitted regarding Parker and Matson Associate General Counsel Janowiak communications with Royce:

March 5, 2020: Royce emailed an apparent MEBA CBA to Parker with comments. (Un. Ex. 3) And another: "Attached are some authorities I turned up researching third parties affected by arbitration decisions." (Un. Ex. 4) Parker also sent Royce Young's three-option email: "Liam: You don't know how this arrived in your inbox, SVP."

March 6, 2020: Royce emailed Parker about the MEBA Collective Bargaining Agreement. Parker quoted a provision concerning waiver of jurisdiction early on March 6. (Un. Ex. 6) In response, an hour later, Royce wrote to Parker:

> "My client is exploring remedies to protect its Womens Bay operations. Attached is a draft petition to vacate Mr. Kagel's decision to the extent it would harm Samson.

23

No decisions have been made at this time regarding filing this petition or a similar action seeking injunctive relief." (Un. Ex. 8)

March 8, 2020: Royce asked Parker for a copy of the Alaska Arbitrator's decision, the precursor to the Coast Award. (Un. Ex. 9) He also sent Parker a decision of the District Court by Chief Judge Burgess who was eventually assigned to the Samson lawsuit: *Baseden v. Alaska*, denying a motion to vacate an arbitration award. (Un. Ex. 10) Parker sent a copy of the February Coast Award to Royce. (Un. Ex. 12) Royce emailed he had that; he wanted the earlier Alaska Arbitrator's decision. (Un. Ex. 13) Parker sent Royce information that a decision against the ILWU in Oregon had reduced a $93 million judgment to $19 million on remittitur. (Un. Ex. 14) Royce emailed back that he had seen that decision. (Un. Ex. 17)

Also on March 8, Royce asked Parker if a quotation from *APL v. ILWU*, a 2014 case provides "a road map for a [NLRA Section] 303 case," outlining the basis of Samson's first amended complaint filed later. (Un. Ex. 18) He also sent Parker a decision in *Durhan School Services v. Teamsters 509*, a South Carolina District Court decision, also a Section 303 case. (Un. Ex. 19)

March 17, 2020: Royce requested and Parker sent a copy of the AALA. (Un. Exs. 20-21)

April 1, 2020: Royce sent Parker the Samson-APL Connecting Carrier Agreement. (Un. Ex. 24)

May 1, 2020: Royce forwarded to Parker Young's March 5 three-option email sent to Royce from MEBA counsel. (Un. Ex. 25)

24

May 9, 2020: Royce sent Parker a "clean" petition to vacate with a plan to follow up with an amendment within 21 days as facts develop. (Un. Ex. 27) He also asked Parker about when notice would be required, citing the Federal Arbitration Act, and whether notice is different from a petition. "Thoughts?" (Un. Ex. 28) He also wrote two minutes later that "we are not filing a motion to vacate but rather an independent action/petition to vacate – is distinction apt?" (Un. Ex. 29)

May 10, 2020: After midnight Royce sent another draft and asked for thoughts about the notice question from the day before. (Un. Ex. 30) He sent another draft "about ready for filing" at 2:38 a.m. (Un. Ex. 31) At 10:47 AM Parker sent Royce an excerpt from the *Developing Labor Law* treatise on statutes of limitations and duty of fair representation. (Un. Exs. 32-33) Parker, minutes later, wrote Royce:

> "Here is what I filed against the ILWU in 2016. It was a pretty thin argument on that one and Emily [Maglio, ILWU Counsel] succeeded in getting it dismissed."

The attached complaint argued that the AALA limited penalties for prohibited work stoppages, hence this suit for damages. Parker also opined that "to be safe I'd stay within six months." (Un. Ex. 34) He sent Royce also a letter from Young to APL. (Un. Ex. 35) Royce, at 1:57 p.m., sent Parker the petition as filed with exhibits. (Un. Ex. 36) That evening, Parker advised Royce he did not have the address of a Union officer but would get it the next day. (Un. Ex. 37)

Royce sent Parker, at 10:48, subject: "Petition packet as filed": "Hi Doug, You will find your fingerprints …" (Un. Ex. 38)

25

May 11, 2020: Royce emailed Parker that he would appreciate any arbitration briefs filed by Maston or the ILWU, and that the notice and petition would be served the next day. (Un. Ex. 40)

May 12, 2020: Royce emailed Parker that Chief Judge Burgess was assigned the petition. Information on service and summons was also provided in the email. (Un. Ex. 42)

July 20, 2020: Royce sent Parker a revised petition with new material and additional requests from the Court to include an order prohibiting ILWU "from taking any further actions adverse to Matson, Inc. for the purpose of otherwise obtaining payment of ILWUs time-in-lieu charges ..." (Un. Ex. 50) He later wrote that the original petition remains unchanged and the requested relief "includes prohibiting ILWU from taking adverse actions/retaliation re Matson." (Un. Ex. 52)

July 23, 2020: Royce sent Parker a copy of the Union's motion to dismiss the vacation petition and exhibits. He stated he had not yet filed an amended petition and a complaint for injunctive relief, and he had 21 days to do so after the date of the Union's motion. (Un. Ex. 51)

August 3, 2020: Parker advised Royce when he would be available to talk. (Un. Ex. 52). Royce responded with an appropriate time to do so. (Un. Ex. 53)

December 21, 2020: Matson Assistant General Counsel Jaskowiak had emailed his cell phone number to Royce. Royce stated that it was nice to meet him this morning, and emailed material to Jaskowiak, adding: "(note: I also go by Liam but longtime friends and clients use Bill)" (Un. Ex. 61).

26

December 29, 2020: Maglio emailed the undersigned seeking clarification of the February Coast Award, with copies to Parker and Jaskowiak. (Un. Ex. 60) Jaskowiak thereafter emailed Royce:

> "Bill - The ILWU submitted a request to Arbitrator Kagel about implementation of the arbitration award. We intend to respond with various arguments and would like to highlight that Samson is challenging the award and that it intends to submit a TRO request. Do you have an estimate on when you will send your letter to the ILWU's attorney?" (Un. Ex. 61)

December 30, 2020: Jaskowiak emailed Royce advising that he and Parker would like to connect with him "to discuss the ILWU's submission to Kagel and the TRO that you plan to pursue in the court case." (Un. Ex. 61)

December 31, 2020: Royce wrote to Maglio, with copies to Parker and Jaskowiak, asking that the ILWU not seek to remove Samson from Womens Bay. If that "cannot be resolved informally Samson Tug may need to seek injunctive relief. I have copied counsel for Matson with this letter." (Un. Ex. 62)

January 6, 2021: Royce directed his office to send a copy of ILWU's oppositions to Parker and Jaskowiak. (Un. Ex. 64)

January 15, 2021: Parker asked Royce for a "quick catch-up call with Nathan and me today." Royce responded with a statement that he was on "a conference call with MEBA attorneys to learn more about their recent meeting with ILWU" and to let him know when to call. (Un. Ex. 66)

January 22, 2021: Jaskowiak emailed Royce:

> "I am writing to check in on the status of the filing of the request for injunctive relief. We need to get back to the arbitrator and ILWU by the end of the day on Monday as to the next steps and ideally we would like to have this decision in the hands of the

court and not the arbitrator. Do you have time for a call this afternoon or early on Monday to discuss?"

A Zoom call was arranged for Monday. (Un. Ex. 67)

February 2, 2021: Royce sent Parker and Jaskowiak copies of Samson's motion for a preliminary injunction, along with a Baggen declaration. (Un. Ex. 68)

February 4, 2021: Royce sent both a link to listen to a Samson v. ILWU status conference, if either wanted to. (Un. Ex. 69)

February 5, 2021: Maglio filed notice of the status of its pending request for clarification of the February 2020 Coast award to the undersigned to postpone oral argument until after March 1. Royce forwarded it to Parker and Jaskowiak along with an email string from Maglio, Royce requesting informal disclosure of documents "similar to that sent to both of you earlier today." (Un. Ex. 71-72)

February 7, 2021: Parker wrote to Royce: "Nathan and I disagreed with Emily's statement but not to the form. Thanks for passing it along." (Un. Ex. 73)

February 9, 2021: Royce sent Parker and Jaskowiak the transcript of the February 4 status conference, and asked:

> "Have you determined if I may have copies of materials filed with the Coast Arbitrator and any Orders or decisions of the Coast Arbitrator?" (Un. Ex. 74)

February 11, 2021: Royce sent Parker the Union's brief and exhibits in opposition to Samson's motion for a preliminary injunction, including documents filed with the Coast Arbitrator. (Un. Ex. 75-76) Parker thanked him. (Un. Ex. 77)

28

October 10, 2021: Parker sent Royce the Coast Award of October 4, expressing puzzlement over its reasoning. "Let me know if you are seeing something different on this." (Un. Ex. 76)

January 10, 2022: After the Court denied the Union's certification for an interim appeal and stay, Parker emailed Royce, thanking him for his "heads up," believed Royce was frustrating Maglio with his "usual persistence," and speculating that Judge Burgess "is inclined to go along for a long ride in this case." (Un. Ex. 88)

<u>Issues to be Decided:</u>

The Parties have given the undersigned the authority to determine the issues to be determined in this proceeding. From the record, those are, within the parameters of those stated by the Parties quoted at the outset of this Decision:

1. Whether the Coast Arbitrator should further enforce the February 13, 2020 Award and, as a remedy, direct Matson to reimburse ILWU for its legal fees and costs incurred in defense of the lawsuits filed by Samson Tug and Barge, Case Nos. 3:20-cv-00108-TMB-MMS, 3:20-cv-00248-TMB-MMS (D. Alaska), and any appeals thereof, both prospectively and retrospectively.

2. Whether the Arbitrator has authority under the AALA to order Matson to cease and desist seeking indemnity from third party Samson?

<u>Violation of Agreement Article 19:</u>

As quoted above, Article 19 provides:

"**19.1** As an explicit condition of agreement the parties exchange commitments that this Contract will be observed in good faith. In answer to the Employer's demand for such a guarantee, the Union Negotiating Committee unanimously voted to commit every local and every member to observe such commitments without resort to gimmicks or subterfuge. The Employers gave a similar guarantee of good faith observance on their part.

29

**19.11** In order to implement this good faith guarantee, it is agreed that whenever the local grievance machinery becomes stalled or fails to work, the matter can be referred at once by either party to the next step of the grievance machinery for disposition. Any problems arising over changes in local working or dispatching rules because of the new contract provisions thus can be referred to the next step of the grievance machinery for prompt disposition."

In this case, the Parties met on March 5, 2020, after the Coast decision on February 13, 2020. At that meeting, as described above, it is not disputed that Matson, by authorized representatives, stated it would implement that decision. It would employ ILWU-represented Longshore workers to move Samson's cargo at its owned-Womens Bay facility. It stated it needed time to assemble the necessary equipment to do so, and asked, and received, the Union's forbearance to accept TILs until that could be done. Further, it would enter into a TSA with Samson, which it would immediately undertake to do. By March 20, 2020, it had worked out the manning necessary for TIL purposes.

With these assurances, there would be no need for the Union to confirm the February Award in court given Matson's pledge that it would abide by and affirmatively implement it. Matson expressed, according to this record, no basis to contest that Award as contrary to the terms of the AALA, and the Union was entitled to rely on its voluntary agreement to observe it.

In fact, Matson's actions, directly, and through its legal counsels at its direction and consent, show that it either had then, or shortly thereafter, determined that it would not implement the Award, contrary to its March commitment to the Union. Two cardinal facts establish this: First, it was Matson, not Samson, which drafted Article VII to the TSA. That provision allowed Samson to continue to use its own employees, not ILWU-represented

30

Longshoremen. Matson had assured the ILWU that that would not be the case. Matson had not asked the ILWU for an agreement to allow Samson to use its own labor, as LOU 12 provided as an alternative. The TSA provision was a direct contradiction to its commitment.

In its reply brief, Matson seeks to excuse Matson's deviation from its commitment to implement the February 2020 Coast Award, citing Covid-related service and safety demands and pushback from Samson. Matson had to know it would get such pushback at the time of its commitment through all of the background leading to the February 13, 2020 Coast Award. It also relies on Tungul's statement that at the March 5 lunch, that she advised Baggen of the need for a TSA to allow the Union's members to handle Samson's cargo at Womens Bay. As discussed above, Tungul said she had done so, but she could not remember what Baggen's response was besides "push back." Tungul admitted that her memory of what happened four years prior was not precise in her court deposition. Overall, the evidence is in direct conflict that that occurred as she stated she recalled about March 5. But even if she had the day after Matson's commitment to the Union, Matson's conduct thereafter, Covid or not, showed the opposite as detailed above.

Second, the record shows how deeply Matson's lawyers carried out that same policy of their client. Whether it was inevitable that Samson would go to court to try to escape or avoid the impact of the Coast Award due to its situation at Kodiak is not relevant with respect to Matson's Section 19.1's obligation to operate in good faith. With Matson's commitment to the Union to implement the Award, which it never disavowed to, it barred itself from in any way supporting efforts to undermine Award—whatever its merits—as

31

Samson asked the Court to do in its several amended complaints. The catalogue of what emerged from discovery shows that Matspon undertook efforts contrary to that promise in actively and materially aiding and collaborating with Samson seeking to undermine the Award. Examples are the previously described exhibits of 2020: March 5, 6, 8, May 9, 10, July 20, 23, August 3, December 21, 29, 30, 31. 2021: January 15, 22, February 2, and October 21. As to the original petition to vacate—Parker's fingerprints were praised as being all over it. And in the subsequent Section 303 claims that the Union impermissibly brought its grievance to arbitration at the Coast level as an unfair labor practice—claims that Matson never made in the initial, or subsequent, arbitration proceedings themselves. Not only did the Union show the consistency of the correspondence between Matson and Samson, but also direct involvement as to how to proceed. A particular example is that Matson sought to influence the course of the litigation by actively seeking Samson to apply for an injunction in court to delay or avoid the Coast clarification proceeding—"ideally we would like to have this decision in the hands of the court and not the arbitrator." (Un. Ex. 67)

Matson's position that the Union needed to seek testimony from Royce to explain what he meant in his correspondence reverses that if Matson had some other explanation for what is clear it in the evidence, it could have produced such testimony. That was unlikely to occur, and did not occur, given Matson's references to third- party litigation privilege as cited in its brief.

In short, the record is clear that Matson chose not to carry out its promise to the Union that it would abide by and implement the February 2020 Coast AwardSection 19.1

32

embodies the labor relations maxim that once a deal is made under the AALA it is to be carried out in good faith. Matson acted in bad faith by making its commitment and then substantively directly and consequentially acting against it. It violated Section 19.1 of the Agreement.

<u>Matson's Foreseeability of Damages:</u>

Matson has cited *Hill and Sinicropi, Remedies in Arbitration* (2d ed. 1991) that damages are not recoverable if the Union would have incurred them regardless of a breach of a collective bargaining agreement. (Pps. 492-493) Matson claims that it was Samson's lawsuit that caused the Union to have to pay attorneys' fees and costs, not Matson's conduct.

This case, as ultimately presented, is whether and to what extent a found violation of Section 19.1 requires what remedy? Matson's collaboration with Samson in terms of seeking to eliminate the effects of the original Coast Award was contrary to Matson disavowing any intent to do so. That not only showed the failure of Matson to abide by the good faith it pledged in Section 19.1, it also made Matson liable by that collaboration to the damages the lawsuits had on the Union. And, contrary to Matson's concerns, this is not speculation. There would have been no reason for the constancy of Matson's and Samson's collaboration but to abet and encourage the filing and the progress of the lawsuit to at lesast continue Samson's tenancy to Matson's benefit. Matson had, or should have, foreseen that the Union would be required to have defended itself by financing lawyers' fees, costs and expenses. Matson's position of supporting the litigation, in all of its iterations, would extend and compound those costs as it violated Section 19.1.

33

<u>No Issue Preclusion:</u>

The District Court determined that Samson had entangled itself in Matson's affairs, assisting it with its dispute with the Union from similar evidence as presented here. Yet this record independently and fully supports the above conclusions. They are required by the evidence presented in this case in terms of violation of the Agreement. This decision is not based on issue preclusion by the Court's decision, but by the evidence in these proceedings.

<u>Remedies Under Section 19.1:</u>

There are at least two reasons under Section 19.1 why in this case a remedy is due to the Union. First, the issue as the undersigned was authorized by the Parties to select, and then decide, includes whether a specified remedy can be awarded. "…The submission agreement, coupled with the contract, defines the outer limits of the arbitrator's authority." (Hill, *Remedies in Arbitration* in St. Antoine, editor, *The Common Law of the Workplace, The Views of Arbitrators* (2d ed. 2005) §10.4, comment "The Submission Agreement and Remedial Authority," p. 365)

Second, generally, where there is no agreement to the contrary, it is understood by the Parties that a remedy is within an arbitrator's authority to award. Both Parties have cited to *Hill and Sinicropi, Remedies in Arbitration* (2d ed. 1991). After an extended discussion of authorities, the authors conclude:

> "Both arbitrators and the courts have established that if the arbitrator has jurisdiction of the subject matter, he also has implicit power to fashion an appropriate remedy sufficiently grounded in the contract, even though the agreement is silent as to remedies." (p. 48, *see also,*

34

Hill, *Remedies in Arbitration*, supra, §10.2 "Remedial Authority
When the Contract is Silent," p. 360)

Accordingly, Matson's attempt to constrict the Union's ability to seek any remedy necessarily fails. First, it matters not how Section 11.66 and Appendix E may be interpreted. Matson's agreement of what the issues may be in this matter, with foreknowledge that one viable choice, as was selected here, may authorize the Arbitrator to assess a remedy precludes its argument.

Second, even if that is not so, Matson has not shown how Sections 11.66 and .67 and Appendix E would bar such a finding. To review, they provide:

> "11.66 The powers of the arbitrator shall be limited strictly to the application and interpretation of the Agreement as written…
>
> 11.67 The arbitrator's decisions must be based upon the showing of facts and their application under the specific provisions of the All Alaska Agreement and attendant letters and memorandums of understanding and be expressly confined to and extend only to the particular issue in dispute. …

> **APPENDIX F**
> July 1, 1993
> **ARBITRATION PROCEDURES AND GUIDELINES**
>
> …An Arbitrator has no authority to decide any other issues except those that are in dispute, nor shall the Arbitrator have any authority to add to, subtract from, or otherwise change or modify the provisions of this Agreement. The Arbitrator shall only be authorized to interpret existing provisions of this Agreement as they may apply to the specific facts of the issue in dispute." (Jt. Ex. 1)

Matson has not demonstrated how the decision below would violate the AALA. \ Section 11.66 and Appendix E both authorize an arbitrator to interpret the written provisions of the Agreement. What is interpreted here is Section 19.1 where that interpretation follows accepted arbitral authority given that, with the sole exception of a

35

stalled grievance procedure not involved in this case, there is no limitation on what the remedy may or may not be. The decision interprets the existing provision of the Agreement as Section 19.1 applies to the specific facts of the issue as required and authorized by those Sections and the Appendix.

Matson maintains that Section 19.11 shows that the Parties limited any violation to Section 19.1 to the remedy authorized for a stalled grievance procedure. By its own terms, Section 19.11's application is limited to bad faith violations in the processing of a grievance through the Agreement's grievance procedure, with particular emphasis on new dispatching or working rules. It does not apply by its specific terms to violations of the good faith commitment of Employers in any other situation such as that here. To adopt Matson's claimed limitation with respect to other situations than stalled grievances would essentially render any other violation of Section 19.1 meaningless. And to apply it to Matson's situation would be beyond the authority of the Arbitrator as provided in Sections 11.66 and .67 of the AALA.

Matson refers to Coast Award C-1-90 interpreting the Pacific Coast Longshore Contract Document between the Pacific Maritime Association and the ILWU. The issue in that case was whether monetary damages are available as a remedy for breach of its no-strike clause. In that case, there were clauses similar to Sections 11.66, .67 and Appendix E. However, there were also specific provisions for penalties for work stoppages including fines, suspension or deregistration, and pay disqualification. The Coast Arbitrator, after tracing the history of work stoppages and bargaining going back over 45 years, stated:

36

"In short, it is the Parties to this Agreement that have determined and should determine what remedies are to apply when a breach of contract occurs by either party. Considering the specific history of this relationship between the Parties to the PCLCD, that for the Coast Arbitrator to introduce a new remedy of monetary damages for breach of contract would be amending the Agreement and not applying or interpreting the Agreement as written. The Coast Arbitrator does not have such authority." (1-3-1990, Matson Opening Brief, Attachment A)

This case does not involve a work stoppage issue, and the AALA has provisions in it concerning such incidents. (Jt. Ex. 1, Secs. 11, 11.8, 11.89) In this case, there is no limiting evidence of the past history between the Parties to the AALA Section 19.1. Further, as already noted, unlike the 1990 PCLCD, there is but a single, delimited statement of what a remedy for but one of a potentially myriad of violations of Section 19.1 other than a stalled grievance process; that limited specified factual issue was not involved in this case. Given the distinctions between this case and C-1-90, that decision is not a persuasive authority to affect the interpretation of Section 19.1 by AALA Sections 11.66, .67 an Appendix E here.

Nor is Matson's reliance on the Union's argument seeking to dismiss a complaint by the AMEA in 2016 seeking monetary damages for breach of the AALA no-strike provision. (Matson Opening Br. Attachment B) That pleading contested that the AMEA had not utilized the grievance-arbitration procedure so that the suit should be dismissed since only arbitration could determine whether the AALA had been breached. It then argued the AMEA admitted that it was precluded from a monetary remedy because Section 11.66 limited arbitrators under the AALA who could only interpret the Agreement and could not add to its terms. Whatever the value to that proceeding, these arguments are not

37

germane to this one. It was a pleading in a court case with no shown history, if any, of AALA arbitration or bargaining history, nor even discussion of Section 11.89 let alone Section 19.1, assuming those provisions were then in the AALA. This case does not involve a no-strike issue, is unique to its own facts, and cannot extend its decision beyond its facts as found here and as applied to the specific issue to be decided pursuant to the Parties' hearing stipulation.

<u>Union's Claims for Market Rate Attorneys' Fees and Sanctions:</u>

The Union seeks an award of market rate attorneys' fees. It states

> "Leonard Carder charges its union clients, including ILWU, below market rates in solidarity with their efforts to obtain workplace, social, and economic justice as well as in recognition of the fact that they are funded through union dues collected from working people. However, when Leonard Carder seeks sanctions for bad faith conduct and when Leonard Carder represents a prevailing party in litigation subject to a fee shifting statute, Leonard Carder seeks and regularly obtains recovery at or above their reasonable market rates." (Opening Br. n. 22)

The remedy here is to make the Union whole for its damages. Those damages are what it had to pay and, perhaps will have to pay given the appeal of the summary judgment, and even potential further court proceedings if that is rejected. The Union has cited case authority where a District Court has expressly exercised its inherent authority to award attorneys' fees and impose sanctions for matters before it. No collective bargaining arbitration decision was cited so holding that. Neither that request nor the request to sanction Matson is granted.

38

Fees and Costs of Arbitrations:

The Union does not seek its fees and costs for the February 20, 2020 Coast proceeding, but does for the subsequent clarification proceeding and this decision. The AALA provides that those costs are "borne equally by the Parties." (Jt. Ex. 1, Sec. 11.74)

Section 11.72 provides that the total cost of the Coast Arbitrator is that of the party that is in disagreement with the Alaska Area Committee's decision concerning an appeal from the Alaska Arbitrator. (Jt. Ex. 1, Section 11.73) However, in this case, that has not been the situation where the Parties have heretofore split the Coast Arbitrator's costs, including travel expenses. That mutual waiver of Section 11.72 will apply to this, and any subsequent related Coast decisions in this matter.

Officers and Members Litigation Participation:

The Union seeks all related expenses of ILWU officers and members to participate in litigation and arbitral proceedings, including travel expenses, per diem, and other compensation.

While Union officers and members attended arbitration hearings, those activities are accounted for in Section 11.73 of the AALA. With respect to litigation, it would be foreseeable that one Union official could be required to attend depositions and court proceedings. It is reasonable to include such individual's travel expenses as foreseeable damages to the Union by the litigation.

Indemnification Demand by Matson to Samson:

The Matson-Samson TSA has already been found to violate the Agreement as it applied to Samson's work at Womens Bay. However, what it contains and how its terms

39

are to be applied between them is a matter for them as they were the only parties to it. There appears no authority for the Union to insert itself in that relationship in making it whole for its damages in this case.

DECISION:

1. The Union shall be reimbursed for its attorneys' fees, expenses and costs not already paid by Samson with respect to filing its Ninth Circuit appeal, and for the expenses of one Union officer, and for all of the same that it will reasonably incur until there is a final judgment entered in the Samson-ILWU Womens Bay litigation.

2. The Union will provide Matson with its evidence of the foregoing to date within 45 days of the date of this Award, and every three months thereafter.

3. In the event that Matson does not agree with any such submission, Counsel for the Parties will meet and confer with the authority of their clients to settle any such dispute. In the event they cannot agree, either Party can apply to the Coast Arbitrator for adjudication of that dispute within 15 days of the date of such disagreement, with the Coast Arbitrator having the authority to determine the costs and expenses of such dispute,

4. Any other relief sought by the Union is denied.

Coast Arbitrator

IN ARBITRATION PROCEEDINGS PURSUANT TO THE
COLLECTIVE BARGAINING AGREEMENT BETWEEN THE
PARTIES

| | | |
|---|---|---|
| INTERNATONAL LONGSHORE AND WAREHOUSE UNION, KODIAK LONGSHORE UNIT 222, | ] ] ] | |
| | ] | Decision |
| Union, | ] ] ] | |
| and | ] ] | of |
| | ] ] | John Kagel |
| EMPLOYERS SIGNATORY TO THE ALL ALASKA LONGSHORE COLLECTIVE BARGAINING AGREEMENT, | ] ] ] ] ] ] | Coast Arbitrator |
| Employers. | ] ] | May 16, 2025 |
| | ] | Palo Alto, California |
| Re: Appeal of AK-2018-08, item 5, remedy Explanation of Decision #1 | ] | |

To the extent that Decision #1 of the Opinion and Decision in this matter of this date might be considered ambiguous, it applies to Case Nos.3:20-cv-00108-TMB-MMS, 3:20-cv-00248-TMB-MMS (D. Alaska), any appeals therefrom and any further federal court proceedings until there is a final judgment entered in the Samson-ILWU Womens Bay litigation.

Coast Arbitrator

1